UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEISHA ALLEN,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        No. 1:19-cv-3926
                                       )
ARAMARK CAMPUS, LLC,, and UNITE        )
HERE LOCAL 1,                          )
                                       )
            Defendants.                )

## COMPLAINT

Plaintiff, Ms. Keisha Allen ("Ms. Allen"), by and through the undersigned counsel, for her complaint against Defendants Aramark Campus, LLC ("Aramark") and Unite Here Local 1 ("Union"), states as follows:

## PRELIMINARY STATEMENT

1.     This action is brought under 42 U.S.C. § 2000e-1, et seq., Title VII of the Civil Rights Act of 1964 ("Title VII").

2.     Defendant Aramark hired Plaintiff, Ms. Keisha Allen, as a cook in August 2014.

3.     Ms. Allen satisfactorily met the requirements of her job description.

4.     Nonetheless, Aramark terminated her in December 2015.

5.     Aramark subjected Ms. Allen, to a hostile work environment, and subjected her to disparate treatment, including adverse actions including but not limited to termination, all of these because of her sex, sex stereotyping, gender, gender expression and gender identity, and because of retaliation for her opposition to discrimination and prior protected activities.

6.     In so doing, Defendant Aramark violated the collective bargaining agreement negotiated by her Union, Unite Here Local 1.

7.     When Ms. Allen requested representation from her Union to address the hostile work environment she was experiencing, the Union failed and refused to provide assistance to her because of her sex, sex stereotyping, gender, gender expression and gender identity, actively interfering with her attempts to address the hostile work environment and adverse actions of Aramark and its employees and representatives.

8.     In so doing, the Union allowed Aramark's breach of duty to go unrepaired.

9.     In so doing, the Union breached its duty of fair representation to her.

10.     In so doing, the Union condoned, ratified and/or endorsed Aramark's hostile work environment and adverse actions against her.

11.     In so doing, the Union treated Ms. Allen differently from similarly situated workers outside of her protected class.

12.     In so doing, the Union violated Ms. Allen's federally protected rights under Title VII.


**PARTIES**

13.     Plaintiff, Ms. Keisha Allen, is a 51-year-old Black woman residing in Chicago, Illinois.

14.     Defendant Aramark Campus LLC ("Aramark") is a food services company incorporated in Delaware and with a place of business located in Chicago, Illinois.

15.     Defendant Unite Here Local 1 ("Union") is a labor organization located in Chicago, Illinois, engaged in an industry affecting commerce in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of

employment, and is the certified representative of employees under the provisions of the National Labor Relations Act, as amended

16.     Aramark employs at least 15 full-time employees and is a covered employer under Title VII.

17.     The Union has at least 15 members and is a covered labor organization under Title VII

18.     Ms. Allen was employed by Defendant Aramark at Loyola University in Chicago, Illinois at all times relevant to this suit.

19.     Ms. Allen was a member of the Union at all times relevant to this suit.

## JURISDICTION AND VENUE

20.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States, specifically Title VII.

21.     Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the Northern District is a district in the State in which the unlawful employment practices are alleged to have been committed, and it is the judicial district in which the employment records relevant to such practices are maintained and administered, and it is the judicial district in which the Defendant Union has its principal office.

## PROCEDURAL HISTORY

22.     On July 3, 2015, Ms. Allen timely filed charges of race discrimination, sex discrimination, disability discrimination, and retaliation with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission

("EEOC").

23.    Upon information and belief, the EEOC provided Defendants with timely notice of the

charges of discrimination.

24.    On March 20, 2019, Ms. Allen received Notices of Right to Sue from the EEOC for

each Defendant.

25.    Ms. Allen has commenced suit within the 90 day period from receipt of each Notice of

Right to Sue.

26.    Ms. Allen has exhausted all necessary remedies under the Union contract.

27.    Ms. Allen has taken all necessary steps to fulfill all conditions precedent to the

commencement of this lawsuit.


**STATEMENT OF FACTS**

28.    Ms. Allen is a female citizen of the United States.

29.    Ms. Allen has a female gender identity.

30.    Ms. Allen has a feminine gender expression.

31.    Ms. Allen is a woman who is transgender.


**Sex, Gender, Gender Expression, and Gender Identity**

32.    *Sex* is a term that includes gender, gender expression, and gender identity within its

meaning.

33.    *Sex stereotyping* refers to the application by an employer of stereotypes related to sex

to restrict, disparage, or discriminate on the basis of an employee's gender expression or

identity.

4

34. *Gender* refers to cultural expectations specific to the sexes.

35. *Gender expression* refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth.

36. *Gender identity* refers to a person's internal sense of sex, being male, female, or other.

37. Gender identity is intractably rooted at a very early age and cannot be changed.

38. *Transgender individuals* are people who have a gender identity that does not match the sex they were assigned at birth.

39. *Gender transition*. Transgender individuals often seek out legal, social, and medical means of aligning external manifestations of their sex and gender with their gender identity. This process is colloquially known as gender transition or transition.

40. Discrimination against transgender people for being transgender is discrimination based on their sex, sex stereotyping, gender, gender expression, gender identity, or gender transition.

41. A *transgender woman* is a person who lives her life as a female and has a female gender, gender expression and gender identity.

42. It is appropriate to refer to a transgender woman with female titles, honorifics (e.g., Miss, Ms., or Mrs.), and pronouns (e.g., her, hers, and she).

43. Referring to a transgender woman with male titles, male honorifics, male pronouns, or by a previous male name is called "misgendering."

44. Studies have shown that repetitive misgendering causes serious emotional distress to transgender persons.

**Employment with Defendant Aramark and Membership with Defendant Union**

45. Ms. Allen, a Black woman, was hired as a cook by Aramark in August 2014.

46.     Her job performance as a cook was satisfactory and met the expectations set forth in Defendant's job description.

47.     She was a member of the Union.

48.     The Union was her representative for purposes of dealing with Aramark concerning grievances.

**Ms. Allen's Escalating Experience With Physical Violence and Harassment**

49.     From August 2014 through late November 2014, Ms. Allen was misgendered and otherwise verbally harassed by supervisors, managers, and coworkers.

50.     Ms. Allen was treated as a male by supervisors, managers and coworkers, and consistently called by the wrong name and pronouns, despite her advising them that she should be treated as a female and called by her correct, female name and female pronouns.

51.     Ms. Allen was also under constant threat of physical violence and intimidation.

52.     Supervisors, managers and coworkers, by their words and actions, intended to and did frighten Ms. Allen with threats of physical violence.

53.     Ms. Allen was physically assaulted on more than one occasion.

54.     For example, on November 3, 2014, while at work, Ms. Allen was assaulted in a sexual manner by coworker Sabreen Camacho, who forcefully slapped Ms. Allen's buttocks and grabbed her breasts, causing pain, humiliation and emotional distress to Ms. Allen.

55.     Camacho asked Ms. Allen whether her breasts were "real."

56.     Ms. Camacho had previously indicated by words and gestures that she had a bias against transgender people such as Ms. Allen.

57.    Ms. Allen reported this incident of sexual assault and harassment to the Aramark Hotline (case no.14-11-0147).

58.    Defendant Aramark did not take prompt and effective action to address this physical violence and harassment.

59.    As another example, on November 6, 2014, Ms. Allen was physically assaulted by co-worker Candace (last name unknown) around 8:30 pm.

60.    Candace took hold of two metal food carts and rammed them into Ms. Allen in full view of several coworkers, managers, and supervisors, causing injury, pain, humiliation and emotional distress to Ms. Allen.

61.    Candace intentionally aimed the carts at Ms. Allen's genitals because she intended to make a statement by her actions regarding Ms. Allen's gender.

62.    Candace had previously indicated by words and gestures that she had a bias against transgender people such as Ms. Allen.

63.    Ms. Allen immediately reported this incident to managers Adrienne (last name unknown) and Armando Cervantes.

64.    Both falsely told her that the assault was "unintentional," and refused her permission to go to Aramark's Human Resources office to report the incident, in an attempt to dissuade her from reporting the incident.

65.    Ms. Allen immediately reported the assault to manager Juan Zuniga.

66.    Mr. Zuniga advised her to leave early to get treatment, and she did so, taking herself to a local hospital emergency room for diagnosis and treatment.

67.    Defendant Aramark did not take prompt and effective action to address this or the other incidents of physical violence and harassment.

68. On November 11, 2014, Ms. Allen met with Amy Trujillo and Amy Dugan and requested permission to go to HR make complaints about sexual harassment and other issues in the workplace.

69. Trujillo and Dugan denied her request.

70. On November 14, 2014, Ms. Allen met with Armando Cervantes and advised him that Candace was continuing to harass her.

71. She told him that Candace had been sweeping trash near Ms. Allen that day, and in the course of this activity, tried to hit Ms. Allen with a cooler door.

72. Ms. Allen told Cervantes that she was frightened for her physical safety.

73. Cervantes told Ms. Allen that Candace had not hit her on purpose.

74. Aramark took no prompt and effective action to address this harassment

75. As a further example, on November 20, 2014, co-worker Candace intentionally attempted to hit Ms. Allen with a heavy industrial food and beverage cooler door, causing Ms. Allen humiliation and emotional distress.

76. Ms. Allen immediately reported this incident to the Aramark Hotline.

77. Defendant Aramark did not take prompt and effective action to address this or the other incidents of physical violence and harassment.

78. On November 22, 2014, co-worker Markeila Moore hit Ms. Allen with her full body.

79. The impact was forceful and intentional, and caused Ms. Allen pain, humiliation and emotional distress.

80. Ms. Allen reported this incident to Aramark.

81. Aramark took no prompt and effective action to address this or the other growing number of incidents of physical violence and harassment.

82. Moore had previously indicated by words and gestures that she had a bias against transgender people such as Ms. Allen

83. On November 23, 2014 at or around 5:30pm, co-worker Sabreen Camacho intentionally and forcefully slammed a heavy industrial food and beverage cooler door into Ms. Allen's shoulder.

84. Ms. Allen was struck so hard that she stumbled several paces, and nearly fell to the ground.

85. This caused her great pain, injury, humiliation and emotional distress.

86. Ms. Allen immediately summoned Loyola Campus Police to report the incident.

87. Campus Police arrived around 11 pm, about five hours after the incident.

88. The Campus Police advised Ms. Allen to make a complaint to the Union, rather than going to HR or filing a police report.

89. Ms. Allen reported this incident to Aramark management and filled out an injury slip with manager Fernando Cerritos around 11:20 pm.

90. Ms. Allen took herself to a local hospital emergency room for diagnosis and treatment.

91. Aramark took no prompt and effective action to address this or the long list of physical assaults and harassment to which Ms. Allen had been subjected.

92. On November 24, 2014, co-worker Sabreen Camacho confronted Ms. Allen in the women's restroom at work.

93. Comacho told another coworker that Ms. Allen is a "faggot," referred to her as a "he/she" and a "man."

94. This caused great humiliation and emotional distress to Ms. Allen.

95. Rather than confront them about the inappropriateness of these words, which raised concerns for her physical safety, she said "really?" in a soft voice and walked away.

96. After Ms. Allen exited the restroom, and approached an elevator, Camacho ran at Ms. Allen.

97. Camacho put her hands in Ms. Allen's face.

98. Ms. Allen, concerned for her immediate physical safety, intuitively understanding that appearing weak would put her in more danger of being a victim with a person of Camacho's violent nature, told Camacho forcefully to get out of "my fucking face."

99. Fortunately, Ms. Allen had correctly judged the situation, causing Camacho to walk away.

100. At no point did Ms. Allen threaten Ms. Camacho with physical violence by word or deed.

101. Ms. Allen immediately sought out manager Fernando Cerritos and reported this incident.

102. Unbelievably, Aramark still took no prompt or effective action to address this or the many incidents of physical violence and harassment.

103. In fact, Aramark managers advised Ms. Allen on December 2, 2014 that she was being terminated because of this incident.

104. Aramark managers terminated Ms. Allen although they knew she was not at fault in the incident with Camacho.

105. Her termination was motivated by discrimination based on Ms. Allen's sex, sex stereotyping, gender, gender expression, and gender identity, including the need to call the police regarding workers who were harassing and threatening physical harm to Ms. Allen, in that the managers did not wish to, did not know how to, and were not trained by

Defendant to address the prejudices raised in others by Ms. Allen's presence onsite as a transgender woman.

106.    Her termination was motivated by retaliation for Ms. Allen's opposition to discrimination against her based on sex, sex stereotyping, gender, gender expression, and gender identity, as well as retaliation for prior protected activities set forth below.

**Ms. Allen Experience with Sexual Harassment**

107.    Ms. Allen was subjected to sexual harassment in the workplace from August 2014 through November 2014.

108.    From August through October 2014, Ms. Allen's supervisor, Mike Fisher, sexually harassed her with impunity.

109.    After Ms. Allen's first week of employment, Fisher started to create special projects for only them to work on together. These "special projects" always required them to work alone in close proximity.

110.    For example, Fisher often ordered Ms. Allen to work with him in the dry storage area for several hours at a time.

111.    Other employees were not ordered to work with Fisher alone for any length of time.

112.    On several occasions, Fisher requested that Ms. Allen arrive early or work late with him, often alone.

113.    On several occasions Fisher instructed Ms. Allen to help him count money in the safe alone with him.

114.    Shortly after Fisher started creating the "special projects" he requested Ms. Allen's personal cellphone number.

115.    Ms. Allen declined to give Fisher her cellphone number.

116.    Fisher pressured Ms. Allen to give him her cellphone number, hinting that failure to do so would result in problems for her at work, such as discipline for made-up infractions, including but not limited to termination.

117.    Ms. Allen complied with Fisher's pressure and gave him her cellphone number because of her fear of losing her job.

118.    Shortly thereafter, Fisher started to call and text Ms. Allen at all hours of the day and on her days off.

119.    On several occasions Fisher sent Ms. Allen pictures of men in various states of undress and asked her if she found them attractive.

120.    Over time, Fisher escalated his harassment and started creating situations where he could physically touch Ms. Allen.

121.    On several occasions, Fisher rubbed against Ms. Allen when they were working alone on his "special projects."

122.    For example, he would position himself so that his crotch was touching Ms. Allen's buttocks.

123.    He also touched and rubbed Ms. Allen's upper thighs.

124.    He stood very close to Ms. Allen so that they would have to make physical contact when Ms. Allen moved.

125.    Ms. Allen opposed Fisher's advances and told him so.

126.    To overcome her opposition, Fisher intimated that he had control over Ms. Allen's job and make statements that were intended to and had the effect of frightening Ms. Allen for her physical and emotional safety.

127. On several occasions, Fisher gratuitously told her that he had brought his firearm, a handgun, to work with him.

128. Fisher never openly brandished the gun, but on a few occasions, he intentionally showed the outline of the gun through his duffle bag and called Ms. Allen's attention to it.

129. On several occasions, Fisher boasted to her about having a "gun card" and intimated that if something at work did not go his way, he would not hesitate to use his gun.

130. On a few occasions, Fisher told Ms. Allen that he would buy a couch for her to sleep on so that she could stay with him at his apartment.

131. On several occasions, Fisher pressured Ms. Allen to spend time alone with him outside of work.

132. These occasions were unwelcome to Ms. Allen.

133. Fisher made romantic overtures to Ms. Allen on these occasions in an attempt to arrange to date her.

134. Ms. Allen feared for her job and physical safety as a result of Fisher's words and actions, and, as a result, acquiesced on a few occasions.

135. For example, Ms. Allen went with Fisher to a Starbucks near work at least once, where they had coffee.

136. Another time they went to Marshall's.

137. Ms. Allen was disturbed by Fisher's behavior and found it unwelcome and highly offensive, but she feared that for her job and physical safety if she complained.

138. The more Ms. Allen attempted to oppose Fisher's advances, he put more pressure on her to comply with his requests.

139. Ms. Allen's co-worker Jene Terry witnessed many of the incidents with Fisher.

140. On October 13, 2014, Ms. Allen reported ongoing sexual harassment by Fisher to Aramark's Human Resources office and Aramark's Hotline.

141. Aramark did not take prompt and effective action to address Ms. Allen's complaints of sexual harassment by Fisher.

**Ms. Allen's Other Experiences With Harassment**

142. On several occasions, Ms. Allen's co-workers falsely reported her for purportedly committing work violations.

143. Some of the reports were made because they wanted to get her fired because of their bias against her because of her sex.

144. Some of the reports were made because they wanted to get her fired in order to cover up their harassment.

145. On November 3, 2014, co-worker Sabreen Camacho, after on the same day having sexually assaulted Ms. Allen as set forth above, falsely accused Ms. Allen of stealing food and being rude to other employees.

146. These allegations were false, and Ms. Allen denied them to her managers.

147. On November 4, 2014, Camacho again falsely accused Ms. Allen of being rude to her and another coworker.

148. These allegations were false, and Ms. Allen denied them to her managers.

149. On November 7, 2014, some of Ms. Allen's coworkers falsely accused her of stealing food and giving it to a student.

150. These allegations were false, and Ms. Allen denied them to her managers.

151.    An investigation was conducted, and Ms. Allen was found to have not committed a violation.

152.    Ms. Allen reported the incidents alleged above to Aramark managers, to Aramark's Hotline, and to Aramark's Human Resources Office, as well as to Loyola Campus Police.

153.    The incidents alleged above occurred in front of Aramark's managers.

154.    Similarly-situated employees outside of Ms. Allen's protected category were not treated in this manner.

155.    Ms. Allen also made several oral complaints about discrimination and other unfair treatment via Aramark's Hotline.

156.    These complaints include but are not limited to the following case numbers: 14-10-0084, 14-10-0089, 14-10-0188, 14-11-0009, 14-11-0147, 14-11-0232, 14-11-0368, 14-11-0370, 14-12-0090.

157.    Aramark took no prompt or effective action based on these complaints to address the harassment and retaliation of which Ms. Allen was complaining.

158.    On November 20, 2014, Ms. Allen sent a fax to Colleen Burns of Aramark's Hotline, requesting a time to speak to her about the physical violence, harassment and retaliation issues in the workplace.

159.    Burns never responded to Ms. Allen.

160.    Ms. Allen requested to be transferred to a different department on several occasions so that she would not have to experience the harassment and hostile work environment she was experiencing on her current shift.

161.    Ms. Allen's requests to be transferred were denied or ignored.

**The Hostile Work Environment Was Also Based On Other Protected Categories**

162. Aramark's managers freely and openly expressed bias towards protected categories.

163. Aramark did not take prompt and effective action to address this hostile work environment.

164. For instance, manager Juan Zuniga regularly made comments disparaging Black persons.

165. Once or twice a month every month Zuniga would say something to the effect of: "I do not like Black managers because all Black managers steal."

166. Manager Fernando Cerritos expressed similar sentiments.

167. On several occasions, Ms. Allen overheard Zuniga and Cerritos joking about having to fire a Black manager for stealing and that neither of them were "comfortable" with Black managers.

168. On at least one occasion Ms. Allen overheard Zuniga and Cerritos say that Mike Fisher, a Black manager, would "steal" and implied Fisher was prone to stealing because he is Black.

169. The discriminatory stereotypes managers held often impacted their judgment, as well as skewed their approach to investigations and discipline.

170. For instance, when Ms. Allen was accused of stealing in November 2014, Fernando Cerritos implied that she was prone to stealing because she is Black.


**Ms. Allen Engaged in Protected Activities**

171. On several occasions, Ms. Allen attempted to oppose unlawful discrimination in the workplace.

172. Ms. Allen engaged in protected activities on several occasions.

173. On November 3, 2014, Ms. Allen filed a charge against Aramark's customer, Loyola University, with the Chicago Commission on Human Relations.

174. Aramark was made aware of this charge at or about that time.

175. On November 3, 2014, Ms. Allen attempted to file a grievance with the Union.

176. She went to the Union's office located at 218 South Wabash, Chicago, Illinois in order to file a grievance under the Union contract, which she requested to do.

177. She was not permitted to file a grievance.

178. Although she requested an explanation, the Union officials with whom she spoke refused to give her an explanation for why she could not file a grievance.

179. Upon information and belief, although the Union refused to allow her to file a grievance, it advised Aramark of her attempt to do so, which led to retaliation by Aramark.

180. On November 10, 2014, Ms. Allen complained to Aramark managers Amy Dugan, Juan Zuniga, and Amy Trujillo about discrimination in the workplace.

181. On or about November 15, 2015, Ms. Allen filed a dual complaint against Aramark with the IDHR and the EEOC.

182. Upon information and belief, Aramark was made aware of this charge by the EEOC within two weeks from the date of filing.

183. On or about November 15, 2015, Ms. Allen filed a charge against co-worker Camacho with the IDHR.

184. Upon information and belief, Aramark was made aware of this charge within two weeks from the date of filing.

185. Ms. Allen was terminated on December 2, 2015.

### Ms. Allen's Experiences with Retaliation

186.  Ms. Allen was unfairly disciplined on several occasions because she complained about and/or otherwise opposed unlawful discrimination.

187.  Much of this discipline closely followed and/or coincided with her opposition activities.

188.  For example, on November 6, 2014, the same day Ms. Allen complained about the harassment she experienced, Ms. Allen was called into a meeting with Juan Zuniga.

189.  She was advised the meeting was to discuss the complaint Ms. Allen made to the Aramark Hotline about Markeila Moore saying that Ms. Allen was acting "too much like a woman" and kicking Ms. Allen.

190.  Juan told her that Moore's kicking her was "an accident," and that there was nothing he could do about it because it did not constitute assault.

191.  Disregarding Ms. Allen's complaint, Juan accused her of stealing food and giving it to a student, which is a policy violation.

192.  Ms. Allen told Juan she did not steal food for a student.

193.  Juan accused her of stealing food in retaliation for her complaints of discrimination.

194.  On another occasion, November 10, 2014, also a day on which Ms. Allen complained about discrimination in the workplace, she was called to see management three different times and given false write-ups for separate and distinct workplace infractions during each meeting.

195.  Ms. Allen did not commit any of these violations.

196.  In one of those meetings, Ms. Allen met with managers Amy Trujillo and Amy Dugan, the purposed of which was to discuss her complaint against Candace regarding the incident set forth above.

197.   Trujillo and Dugan told Ms. Allen that she was "the problem."

198.   They advised her that she had been accused of stealing food and giving it to a student.

199.   They then wrote her up for being tardy or absent.

200.   On the write-up, they wrote that Ms. Allen had been previously counseled on attendance issues in October 2014.

201.   They were aware that Ms. Allen had not, in fact, been previously counseled on attendance.

202.   The write up was retaliatory in nature, with the intent of dissuading her from making further opposition to and complaints about discrimination.

203.   On November 17, 2014, Ms. Allen met with Amy Trujillo and Amy Dugan twice.

204.   During both of these meetings, Ms. Allen was advised that she should not tell managers when she is assaulted or otherwise discriminated against by coworkers.

205.   Ms. Allen was then given spurious counseling to not wear a grey sweater underneath her shirt.

206.   This was an attempt to intimidate her into complying with their request not to report harassment because the implication was that management would closely scrutinize Ms. Allen in an attempt to identify work violations.

207.   Towards the end of this conversation, in response to Ms. Allen's previous requests to be transferred to a different department so that she would not have to continue to experience harassment and hostile work environment, Trujillo advised Ms. Allen that she could not transfer her to a new department.

208.   She told Ms. Allen that "the attorney" told her she could not move her, even though they knew the environment was "toxic."

209.     Trujillo told  Ms. Allen that all of her managers and "five others" would testify against Ms. Allen if she tried to make a statement against Aramark.

210.     Ms. Allen reported these issues to the Aramark Hotline (Case No. 14-11-0009).

211.     Aramark did not take prompt and effective action to address this harassment and retaliation.

212.     On October 29, 2014, Ms. Allen spoke with Colleen Burns from the Aramark Hotline to discuss her complaints.

213.     Instead, Ms. Burns interrogated Ms. Allen about Ms. Allen's conduct.

214.     She asked whether Ms. Allen "yelled at Markeilla," and if she was speaking ill of a co-worker, "Remi."

215.     Burns did not appear to be investigating Ms. Allen's complaints, but instead was investigating Ms. Allen for the purpose of retaliation for her complaints and to manufacture grounds for discipline.

216.     On October 30, 2014, Ms. Allen spoke with Burns again, and asked Burns if she could move to a different department because the work environment was toxic and unsafe.

217.     Burns advised that she could not address that, and that Ms. Allen had to speak with management.

218.     Ms. Allen did make this request of management, but her request was denied.


**Wrongful Termination**

219.     Shortly after the November 24, 2015 incident in which Camacho assaulted her, Ms. Allen was put on paid suspension pending investigation.

220. On December 2, 2015, Ms. Allen was notified by Aramark that she was being terminated effective immediately and that the reason for the termination was her use of an expletive during the incident on November 24, 2015.

221. Other similarly situated employees not in Ms. Allen's protected category regularly swore in the workplace, but were neither investigated nor disciplined for swearing.

222. This was Ms. Allen's first offense of swearing, so her termination on this basis violated the progressive discipline policy in force at her workplace.

223. The exigency of the circumstances justified Ms. Allen's swearing at Camacho on November 24, particularly the danger of inviting further assault by appearing weak, for which she had a proper defense of provocation, and thus it was not inappropriate for Ms. Allen to oppose the assault by swearing without the use of physical force.

224. Camacho had physically assaulted Ms. Allen the previous day and Ms. Allen reasonably feared for her physical safety when Camacho approached her, extending her hand and physically intimidating her by her proximity.

225. Ms. Allen's reaction was calculated and was the least disruptive action she believed she could take in order to avoid physical injury.

226. Ms. Allen's use of an expletive was in opposition to harassing conduct by Camacho based on sex, sex stereotyping, gender, gender expression and gender identity.

227. Aramark's reason for termination as set forth above was not a legitimate, non-discriminatory reason because it was a pretext for discrimination against Ms. Allen by Aramark based on sex, sex stereotyping, gender, gender expression and gender identity.

228. Aramark's reason for termination as set forth above was not a legitimate, non-discriminatory reason because it was based on Ms. Allen's opposition to harassing

conduct by Camacho based on sex, stereotyping, gender, gender expression and gender identity.

229.    Aramark's reason for termination as set forth above was not a legitimate, non-discriminatory reason because it was a pretext for retaliation against Ms. Allen for her opposition to harassing conduct and hostile work environment by Aramark based on sex, stereotyping, gender, gender expression and gender identity, and for her prior protected activities of making complaints to the EEOC, IDHR and City of Chicago Commission on Human Relations.

**Union's Failure to Pursue Grievances on Equal Terms**

230.    From August 2014 through December 2014, Ms. Allen was a dues-paying member of the Union.

231.    On several occasions in October and November 2014, Ms. Allen attempted to file grievances and/or advise the union about discrimination in the workplace.

232.    When Ms. Allen attempted to make complaints, she was improperly told that she had not yet been 90 days in her position and thus could not file grievances with the Union.

233.    Union representatives did not advise Ms. Allen when she would hit the 90-day mark or otherwise advise her of her rights once the 90-day waiting period ended.

234.    Over the course of meetings in October 2014 and November 2014, Ms. Allen advised union representatives about the following issues:

    a.   Sexual harassment from Mike Fisher.

    b.   Sexual harassment from Sabreen Camacho.

    c.   Assaults by Sabreen Camacho, Candace, and Markelia Moore.

      d.  Other hostilities in the workplace including misgendering and disparate treatment.

235.    Union officials exhibited bias against Ms. Allen based on her sex, sex stereotyping, gender, gender expression and gender identity by word and deed.

236.    Union officials refused to use Ms. Allen's correct, female name, Keisha, despite her advising them that is her name, and that her incorrect, previous male name was not to be used as it was offensive to her to use that name for her as a transgender woman.

237.    Instead, Union officials' written communications with Ms. Allen continued to use her incorrect, former male name and put her correct, female name in quotation marks, as "Keisha" Allen, to indicate that her gender is not female.

238.    The Union failed to fairly represent her because neither the union steward nor any other union representatives expressly advised her of her right to file grievances with the union about the discrimination she experienced in the workplace.

239.    Similarly-situated Union members outside of Ms. Allen's protected category complaining of similar treatment were advised of the Union's grievance process.

240.    Ms. Allen's union steward and other Union representatives were biased against her because of her sex, sex stereotyping, gender, gender expression and gender identity, and as a result did not offer her assistance that other union members would have been offered to pursue grievances.

241.    When Ms. Allen reported the November 23 assault to her Union steward, she told Ms. Allen that it "wasn't a big deal," and did not advise Ms. Allen of her right to file a grievance with the Union.

242.    As a result of the Union's failure to fairly represent her, Ms. Allen was exposed to a hostile work environment, a retaliatory hostile work environment, and wrongful

termination based on sex, sex stereotyping, gender, gender expression, gender identity and retaliation for prior protected activity.

## CAUSES OF ACTION

### COUNT I
**Hostile Work Environment Based on Sex**
**Against Defendant Aramark**
**42 U.S.C. § 2000e et seq.**

243. Plaintiff, Ms. Keisha Allen, re-alleges paragraphs 1 through 242 as if fully set forth herein.

244. Plaintiff was subjected to physical violence, threats of physical violence, discriminatory statements, verbal epithets, and sexually harassing conduct based on sex, sex stereotyping, gender, gender expression and gender identity by Defendant, as set forth above, including but not limited to its co-workers and managers and her own supervisor.

245. Defendant was on notice of this harassment.

246. This harassment was unwelcome to Plaintiff.

247. This harassment was severe or pervasive.

248. This harassment detrimentally affected Plaintiff's work.

249. This harassment was viewed as hostile and abusive by Plaintiff.

250. This harassment would be viewed as objectively hostile and abusive by a reasonable transgender woman.

251. This harassment constituted a hostile work environment based on sex, sex stereotyping, gender, gender expression and gender identity.

252. Plaintiff complained to Aramark managers and her own supervisor about this hostile work environment.

253. Aramark managers and her own supervisor witnessed and participated in this hostile work environment.

254. As a result of Plaintiff's complaints, Aramark had actual or constructive notice of this hostile work environment.

255. Aramark failed to take prompt and effective action to prevent or correct this hostile work environment.

256. By engaging in the conduct described above, Defendant intentionally discriminated against Plaintiff with malice or reckless indifference to her federally protected rights under Title VII.

257. As a direct and proximate result of the hostile work environment described above, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.

**COUNT II**
**Hostile Work Environment Based on Retaliation**
**Against Defendant Aramark**
**42 U.S.C. § 2000e et seq.**

258. Plaintiff, Ms. Keisha Allen, re-alleges paragraphs 1 through 242 as if fully set forth herein.

259. Plaintiff complained to Defendant Aramark about discrimination by Defendant and its employees, including physical violence, threats of physical violence, discriminatory statements, verbal epithets, and sexually harassing conduct, based on sex, sex stereotyping, gender, gender expression and gender identity, as set forth above.

260. As a result of these complaints, which Defendant communicated to its managers and employees, including those responsible for the harassment and hostile work environment experienced by Plaintiff, but about which Defendant took no prompt and effective action, Ms. Allen was harassed on a daily basis by Defendant's managers and employees because she had made complaints about them, and in retaliation for those complaints, as set forth above.

261. This harassment was unwelcome to Plaintiff.

262. This harassment was severe or pervasive.

263. This harassment detrimentally affected Plaintiff's work.

264. This harassment was viewed as hostile and abusive by Plaintiff.

265. This harassment would be viewed as objectively hostile and abusive by a reasonable transgender woman.

266. This harassment constituted a hostile work environment based on retaliation.

267. Plaintiff complained to Geodis managers and her own supervisor about this retaliatory hostile work environment.

268. As a result of Plaintiff's complaints, Aramark had actual or constructive notice of this retaliatory hostile work environment.

269. Aramark failed to take prompt and effective action to prevent or correct this retaliatory hostile work environment.

270. A reasonable employee would be dissuaded by this retaliatory hostile work environment from opposing unlawful discrimination, or making or supporting a charge of discrimination.

271. By engaging in the conduct described above, Defendant intentionally retaliated against Plaintiff with malice or reckless indifference to her federally protected rights to oppose practices that are prohibited by Title VII.

272. As a direct and proximate result of the retaliatory hostile work environment described above, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.

**COUNT III**
**Termination Based on Sex**
**Against Defendant Aramark**
**42 U.S.C. § 2000e, et seq.**

273. Plaintiff, Ms. Keisha Allen, re-alleges paragraphs 1 through 242 as if fully set forth herein.

274. Defendant was on notice of the harassment and hostile work environment Plaintiff suffered, as set forth above, because of sex, sex stereotyping, gender, gender expression and gender identity.

275. Defendant terminated Plaintiff's employment because of sex, sex stereotyping, gender, gender expression, and gender identity.

276. Defendant's termination of Plaintiff was the proximate cause of Plaintiff's injuries.

277. Plaintiff suffered damages as a result of Defendant's actions.

278. By engaging in the conduct described above, Defendant intentionally retaliated against Plaintiff with malice or reckless indifference to her federally protected rights to oppose practices that are prohibited by Title VII.

279.    As a direct and proximate result of the termination, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.

**COUNT IV**
**Retaliation**
**Against Defendant Aramark**
**42 U.S.C. § 2000e, et seq.**

280.    Plaintiff Keisha Allen re-alleges paragraphs 1 through 242 as if fully set forth herein.

281.    Plaintiff engaged in protected activity when she opposed unlawful discrimination by complaining about harassment and hostile work environment based on sex, sexual stereotyping, gender, gender expression and gender identity, as set forth above.

282.    Plaintiff engaged in Title VII protected activity when she made complaints to the United States Equal Employment Opportunity Commission, the Illinois Department of Human rights and the City of Chicago Commission on Human Relations regarding unlawful discrimination.

283.    Ms. Allen was terminated because of her opposition to unlawful discrimination and Title VII protected activity in violation of 42 U.S.C. § 2000e, et seq.

284.    A reasonable employee would be dissuaded by this adverse action from opposing unlawful discrimination, or making or supporting a charge of discrimination.

285.    By engaging in the conduct described above, Defendant intentionally retaliated against Plaintiff with malice or reckless indifference to her federally protected rights to oppose practices that are prohibited by Title VII.

286. As a direct and proximate result of the retaliation described above, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.

**COUNT V**
**Hostile Work Environment Based on Sex**
**Against Defendant Aramark**
**775 ILCS 5 et seq.**

287. Plaintiff, Ms. Keisha Allen, re-alleges paragraphs 1 through 242 as if fully set forth herein.

288. Plaintiff was subjected to physical violence, threats of physical violence, discriminatory statements, verbal epithets, and sexually harassing conduct based on sex, sex stereotyping, gender, gender expression and gender identity by Defendant, as set forth above, including but not limited to its co-workers and managers and her own supervisor.

289. Defendant was on notice of this harassment.

290. This harassment was unwelcome to Plaintiff.

291. This harassment was severe or pervasive.

292. This harassment detrimentally affected Plaintiff's work.

293. This harassment was viewed as hostile and abusive by Plaintiff.

294. This harassment would be viewed as objectively hostile and abusive by a reasonable transgender woman.

295. This harassment constituted a hostile work environment based on sex, sex stereotyping, gender, gender expression and gender identity.

296. Plaintiff complained to Aramark managers and her own supervisor about this hostile work environment.

297. Aramark managers and her own supervisor witnessed and participated in this hostile work environment.

298. As a result of Plaintiff's complaints, Aramark had actual or constructive notice of this hostile work environment.

299. Aramark failed to take prompt and effective action to prevent or correct this hostile work environment.

300. By engaging in the conduct described above, Defendant intentionally discriminated against Plaintiff with malice or reckless indifference to her state protected rights under 775 ILCS 5 et seq.

301. As a direct and proximate result of the hostile work environment described above, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.


**COUNT VI**
**Hostile Work Environment Based on Retaliation**
**Against Defendant Aramark**
**775 ILCS 5 et seq.**

302. Plaintiff, Ms. Keisha Allen, re-alleges paragraphs 1 through 242 as if fully set forth herein.

303. Plaintiff complained to Defendant Aramark about discrimination by Defendant and its employees, including physical violence, threats of physical violence, discriminatory statements, verbal epithets, and sexually harassing conduct, based on sex, sex stereotyping, gender, gender expression and gender identity, as set forth above.

304. As a result of these complaints, which Defendant communicated to its managers and employees, including those responsible for the harassment and hostile work environment experienced by Plaintiff, but about which Defendant took no prompt and effective action, Ms. Allen was harassed on a daily basis by Defendant's managers and employees because she had made complaints about them, and in retaliation for those complaints, as set forth above.

305. This harassment was unwelcome to Plaintiff.

306. This harassment was severe or pervasive.

307. This harassment detrimentally affected Plaintiff's work.

308. This harassment was viewed as hostile and abusive by Plaintiff.

309. This harassment would be viewed as objectively hostile and abusive by a reasonable transgender woman.

310. This harassment constituted a hostile work environment based on retaliation.

311. Plaintiff complained to Geodis managers and her own supervisor about this retaliatory hostile work environment.

312. As a result of Plaintiff's complaints, Aramark had actual or constructive notice of this retaliatory hostile work environment.

313. Aramark failed to take prompt and effective action to prevent or correct this retaliatory hostile work environment.

314. A reasonable employee would be dissuaded by this retaliatory hostile work environment from opposing unlawful discrimination, or making or supporting a charge of discrimination.

315.  By engaging in the conduct described above, Defendant intentionally retaliated against Plaintiff with malice or reckless indifference to her state protected rights to oppose practices that are prohibited by 775 ILCS 5 et seq.

316.  As a direct and proximate result of the retaliatory hostile work environment described above, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.

## COUNT VII
### Termination Based on Sex
### Against Defendant Aramark
### 775 ILCS 5 et seq.

317.  Plaintiff, Ms. Keisha Allen, re-alleges paragraphs 1 through 242 as if fully set forth herein.

318.  Defendant was on notice of the harassment and hostile work environment Plaintiff suffered, as set forth above, because of sex, sex stereotyping, gender, gender expression and gender identity.

319.  Defendant terminated Plaintiff's employment because of sex, sex stereotyping, gender, gender expression, and gender identity.

320.  Defendant's termination of Plaintiff was the proximate cause of Plaintiff's injuries.

321.  Plaintiff suffered damages as a result of Defendant's actions.

322.  By engaging in the conduct described above, Defendant intentionally retaliated against Plaintiff with malice or reckless indifference to her state protected rights to oppose practices that are prohibited by 775 ILCS 5 et seq.

323. As a direct and proximate result of the termination, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.

**COUNT VIII**
**Retaliation**
**Against Defendant Aramark**
**775 ILCS 5 et seq.**

324. Plaintiff Keisha Allen re-alleges paragraphs 1 through 242 as if fully set forth herein.

325. Plaintiff engaged in protected activity when she opposed unlawful discrimination by complaining about harassment and hostile work environment based on sex, sexual stereotyping, gender, gender expression and gender identity, as set forth above.

326. Plaintiff engaged in protected activity under 775 ILCS 5 et seq. when she made complaints to the United States Equal Employment Opportunity Commission, the Illinois Department of Human rights and the City of Chicago Commission on Human Relations regarding unlawful discrimination.

327. Ms. Allen was terminated because of her opposition to unlawful discrimination and state protected activity in violation of 775 ILCS 5 et seq.

328. A reasonable employee would be dissuaded by this adverse action from opposing unlawful discrimination, or making or supporting a charge of discrimination.

329. By engaging in the conduct described above, Defendant intentionally retaliated against Plaintiff with malice or reckless indifference to her federally protected rights to oppose practices that are prohibited by 775 ILCS 5 et seq.

330. As a direct and proximate result of the retaliation described above, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.

**COUNT IX**
**Hostile Work Environment and**
**Termination Based on Sex and Retaliation**
**Against Defendant Unite Here Local 1**
**42 U.S.C. § 2000e et seq.**

331. Plaintiff, Ms. Keisha Allen, re-alleges paragraphs 1 through 330 as if fully set forth herein.

332. Plaintiff was subjected to physical violence, threats of physical violence, discriminatory statements, verbal epithets, and sexually harassing conduct based on sex, sex stereotyping, gender, gender expression and gender identity by Defendant Aramark, as set forth above, including but not limited to its co-workers and managers and her own supervisor.

333. Plaintiff was subjected to a retaliatory hostile work environment because of her opposition to unlawful discrimination and prior protected activities pursuant to Title VII.

334. Plaintiff was terminated by Defendant Aramark because of sex, sex stereotyping, gender, gender expression, and gender identity.

335. Plaintiff was terminated by Defendant Aramark because of retaliation based on her opposition to unlawful discrimination and prior protected activities pursuant to Title VII.

336. The above acts by Defendant Aramark were unlawful and violated the Union contract.

337. Plaintiff attempted to file grievances with Defendant Union as a result of these unlawful and violative activities of Defendant Aramark.

338. Defendant Union had an obligation to fairly represent Plaintiff in grievances filed by Plaintiff against Defendant Aramark.

339. Defendant Union violated this obligation because of sex, sex stereotyping, gender, gender expression and gender identity.

340. Defendant Union refused to permit Plaintiff to file grievances based on Aramark's conduct.

341. Similarly-situated Union members outside of Plaintiff's protected category were permitted to file grievances based on similar conduct.

342. Defendant Union acted unlawfully in failing to investigate grievances filed by Plaintiff because of sex, sex stereotyping, gender, gender expression and gender identity.

343. Defendant Union acted unlawfully in failing to properly investigate grievances filed by Plaintiff sex, sex stereotyping, gender, gender expression and gender identity.

344. By engaging in the conduct described above, Defendant intentionally discriminated against Plaintiff with malice or reckless indifference to her federally protected rights under Title VII.

345. As a direct and proximate result of the hostile work environment described above, Plaintiff suffered damages, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the acts, practices, and omissions complained of herein by Defendants are unlawful and violate Title VII;

B.   Permanently enjoin Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against employees and union members who are transgender and/or gender non-conforming;

C.   Permanently enjoin Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from retaliating against employees and union members who oppose unlawful discrimination;

D.   Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for employees who are transgender or gender non-conforming, and which eradicate the effects of Defendants' past and present unlawful employment practices;

E.   Order other affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

F.   Direct Defendants to pay Ms. Allen for past and future non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including lost wages, humiliation, loss of enjoyment of life and other pecuniary and non-pecuniary damages in an amount to be determined at trial;

G.   Direct Defendants to pay Ms. Allen punitive damages for their malicious or reckless conduct described in the foregoing paragraphs, in an amount to be determined at trial;

H.   Award Ms. Allen attorneys' fees, costs, and disbursements as provided by law; and

I.   Award such additional relief as justice may require.


**Jury Trial Demanded**

Dated: June 11, 2019

Respectfully submitted

/s/ Jillian T. Weiss
*Counsel for Plaintiff*

Jillian T. Weiss (#2125011NY)
Law Office of Jillian T. Weiss, P.C.
527 Hudson Street
P.O. Box 20169
New York, New York 10014
(845) 709-3237