**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KEISHA ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19-cv-03926 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| UNITE HERE LOCAL 1, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Keisha Allen, has sued her former union, Unite Here Local 1, for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*[1] Allen claims Local 1 discriminated against her on the basis of her sex when it refused to adequately process two of her valid discrimination grievances against her employer, resulting in her continued harassment at the workplace and ultimately her termination. Local 1 has filed a motion for summary judgment, arguing its handling of Allen's grievances did not give rise to union liability under Title VII. For the reasons set forth below, the Court grants Local 1's motion for summary judgment.

**FACTUAL BACKGROUND**[2]

Aramark Campus, LLC hired Allen as a food service worker at the Loyola University campus in Chicago in August 2014. Allen has alleged that co-workers, supervisors, and managers at Aramark subjected her to repeated sexual harassment, physical assault, and taunts about her transgender status throughout her employment. This abuse allegedly continued—

---

[1] Allen also sued Aramark Campus, LLC, her former employer. She settled her claims against Aramark and Aramark was dismissed from this suit. ECF No. 66.

[2] The facts set forth are undisputed unless noted otherwise.

despite Allen's attempts to seek help from her union—until December 2014, when Aramark fired her and a coworker after they engaged in a heated verbal altercation on November 23. Defendant's Statement of Material Facts (DSMF) ¶¶ 2, 36. While at Aramark, Allen was a member of Local 1, a labor union that represents Aramark employees. DSMF ¶¶ 3-4. At all relevant times, Aramark and Local 1 were parties to a collective bargaining agreement (CBA). DSMF ¶ 6.

*CBA Provisions*

The CBA contains relevant provisions concerning disciplinary actions, discrimination, and disputes arising from the CBA. **First**, Section 15.01 states, "It is agreed that the right to discipline any employee is retained by the Company. The Company will impose discipline only for just cause." Section 15.01 also states that "[i]n cases of severe misconduct, employees may be discharged without prior notice." One example of "severe misconduct" is fighting. DSMF ¶ 7. **Second**, Section 3.01 of the CBA states:

> The Company and the Union agree that they will not discriminate against or harass any of the Company's employees because of the employee's race, color, religion, sex, sexual orientation, age, national origin, disability, veteran status or any other personal characteristic that is protected by applicable law. The Company and the Union also agree that they will not retaliate against any of the Company's employees who complain of discrimination or harassment or who participate in an investigation regarding discrimination or harassment.

DSMF ¶ 8. **Third**, Article 16 of the CBA provides for a grievance and arbitration procedure to resolve a "difference, dispute, or complaint arising expressly from the interpretation, administration, application, or alleged violation of the terms of this collective bargaining agreement." Section 16.04 of the CBA provides for two grievance meetings: a Step 1 and Step 2 meeting. It also provides for referral to arbitration of any grievance when the union is not satisfied with the outcome at Step 2. DSMF ¶ 9.

*Local 1 Grievance Procedure*

Local 1 maintains a contract enforcement division. This division investigates member grievances, determines whether the company has violated the CBA, and pursues remedies through CBA Section 16.04's grievance and arbitration procedure, if appropriate. DSMF ¶ 10. To initiate the grievance process, the member-employee must go to Local 1's office and complete a "Grievance Intake Form." That member then meets with a contract enforcement officer. The officer evaluates the complaint's merit and decides whether to present the grievance to Aramark management. After Local 1 submits the grievance to Aramark, Local 1 and Aramark typically schedule a Step 1 meeting. At Step 1, Local 1 presents the grievance to the Aramark representative and then meets with the Aramark representative to attempt to resolve the grievance. DSMF ¶ 15. Aramark then has an opportunity to respond in writing to the grievance.

If Local 1 is unsatisfied with the results of Step 1 (or decides to skip Step 1 if it would likely be futile), the grievance advances to Step 2. During Step 2, Local 1 escalates the grievance to Aramark's Regional District Manager or another management representative at the company. Aramark then explains why it took the disputed actions and Local 1 can ask Aramark questions about its decisions. DSMF ¶ 17. After Step 2, if Local 1 and Aramark cannot settle the grievance, Local 1 can either withdraw the grievance or submit it to arbitration, which is Step 3. DSMF ¶ 18. Local 1 decides whether to submit unresolved grievances to arbitration based on whether "there is a fair chance of prevailing." DSMF ¶ 20. It occasionally engages outside counsel to help it to evaluate the prospects of prevailing at arbitration. DSMF ¶ 19.

*Allen's Employment at Aramark and Interactions with Local 1*

Allen is a transgender woman. She alleges that, throughout her four-month employment at Aramark, she was subjected to a hostile work environment involving physical violence and

verbal harassment directed at her by coworkers and supervisors motivated by anti-transgender bias. Allen also alleges that she reported these incidents to her employer to no avail and that Aramark unfairly disciplined her on several occasions because she raised these complaints. First Am. Compl. (FAC) ¶¶ 28-170, at ECF No. 23.

Discontented with her treatment, Allen met for the first time with Local 1's Contract Enforcement Officer Cathy Reynolds on November 3, 2014. Allen filled out a Grievance Intake Form dated November 3 describing "ongoing workplace harrassment [sic] at Loyola Univ. due to discrimination and harrassment from employees." ECF No. 79-3 at p. 72. The intake form described the harassment as "Being call [sic] He/she, Im [sic] being too much of a woman thing, deragotory [sic] names," and stated that Allen had "reported all 3 consectives [sic] incidents in this workplace harrassment." Reynolds told Allen that the Union could not file a grievance against coworkers under the CBA. DSMF at ¶¶ 28-30. Reynolds also told Allen that probationary employees could not file grievances against the company for disciplinary notices. Allen claims, however, that she was not seeking to file a grievance against any coworkers or challenging her disciplinary notices at that time. Rather, Allen maintains and has offered evidence indicating that she was seeking Local 1's help with filing a grievance against Aramark, explaining the nature of the "ongoing workplace harassment," and providing Reynolds with notes[3] detailing the abuses she faced and complaints she made to Aramark. Local 1 does not dispute that it would have been appropriate at that time to ask Local 1 for protection against harassment at the company, as opposed to filing a grievance against a coworker for harassment or against Aramark challenging its disciplinary actions against her. Nor does Local 1 dispute that

---

[3] It is unclear from the parties' briefing, the record, and the notes themselves whether Allen provided these notes, or a portion of them, to Reynolds on November 3. In its responses and objections to Allen's statement of material facts, Local 1 points to the fact that multiple pages of the notes are dated after November 6.

Reynolds sent Allen away on November 3 without helping her file a grievance, asking Allen about witnesses, or advising that she could file a grievance against Aramark. Def.'s Resps. & Objs. to PSMF at 1, ECF No. 94.

What the parties dispute is why Reynolds sent Allen away without assistance. Allen claims that Reynolds turned her away upon learning about Allen's gender identity through Allen's complaints detailing the abusive language directed at her by coworkers. Resp. at 1, ECF No. 86. Allen testified that although Reynolds never made any derogatory comments about anyone who was LGBTQ during their meetings, "it wasn't until [Reynolds] found out that I was a transgender woman that it just seemed like …. I just didn't feel like she was receptive towards me and my complaints…." ECF No. 90-2, Allen Dep. Tr. at 198:6-14. Allen has also submitted a post-deposition declaration stating that after Allen told Reynolds she was being harassed because she is a transgender woman, "Reynolds' attitude abruptly changed, and she had a disrespectful attitude towards me," and "[i]t was obvious to me that this change in [Reynolds'] attitude, disrespect and refusal to help was caused by my revealing that I am transgender." Allen Decl. ¶¶30, 33, ECF No. 90-3. For its part, Local 1 claims it was, at worst, a mistake caused by Reynolds' misunderstanding of Allen's complaints—*i.e.*, Reynolds thought Allen wanted to challenge her disciplinary notices or grieve against coworkers, neither of which were viable options.

About three weeks later, on November 23, 2014, Allen had a verbal altercation with one of her alleged harassers, Sabreen Camacho. The details of the altercation are disputed, but Allen has always maintained that Camacho instigated the altercation and used anti-transgender epithets. Aramark suspended both Allen and Camacho pending an investigation. DSMF ¶¶ 31-32. On December 1, Allen filed a grievance regarding her suspension. Local 1, after explaining

that suspensions pending investigation cannot be grieved because it must give the employer an opportunity to investigate the incident, closed the grievance. DSMF at ¶¶ 33-35. Allen does not dispute that Local 1 was correct in closing this particular grievance.

In the course of its investigation, witnesses submitted statements to Aramark stating that Allen instigated the altercation; no witness corroborated Allen's claim that Camacho was the instigator. DSMF ¶¶ 44-45. A manager also submitted a statement to Aramark indicating that Allen had threatened to assault Camacho by telling her they could "take it downstairs," a phrase that Allen does not deny was an offer to physically fight Camacho. DSMF ¶¶ 50, 53. On December 3, 2014, Aramark fired both Allen and Camacho. DSMF at ¶¶ 36-37. Allen's termination notice stated:

> Keisha violated Aramark's Policy Against Sexual Harassment & Other Workplace Harassment and Aramark's Policy Regarding Violence in the Workplace via unwelcome conduct. Specifically, she used profanity in the work place and threated another Associate, in violation of Aramark's values and the referenced policies.

Weiss Decl. Ex. G at UNITE 000419, ECF No. 90-8 at 2.

Allen and Camacho filed separate grievances challenging their terminations DSMF ¶¶ 37, 39. In response, Local 1 investigated the circumstances surrounding the terminations and Allen's claims of workplace harassment. Reynolds, Local 1's Contract Enforcement Officer, requested information from Aramark about Allen's termination, all reports Allen made since her hire, notes about Aramark's investigation, copies of disciplinary records pertaining to other employees who had committed the same offense, and a statement from Camacho. DSMF ¶¶ 41-45. Reynolds also asked a shop steward to question potential witnesses to the altercation—all of whom supported Aramark's conclusion that Allen instigated the altercation and made a threatening statement

toward Camacho—and witnesses to Allen's claims of workplace harassment generally. None of these witnesses were "helpful" to Allen's cause. DSMF ¶¶ 44, 47.

Reynolds moved Allen's grievance directly to Step 2 after Aramark refused to bring two particular managers Allen had requested to a Step 1 meeting. DSMF ¶ 48. Local 1 and Aramark held the Step 2 meeting on January 23, 2015, at which Reynolds requested Allen's reinstatement. Reynolds Dep. Tr. at 60:16-18, ECF No. 79-3 at 173, During this meeting, however, Fernando Cerritos, a manager who witnessed a part of the altercation that led to the firings, stated that Allen threatened Camacho, and Reynolds deemed him credible. DSMF ¶ 52, 54. A second witness, Allen's coworker Candace Mims, also stated at the Step 2 meeting that she felt threatened by Allen, and Reynolds concluded that her statement corroborated Camacho's and the other witness's statements. DSMF ¶¶ 55, 57.

Following the Step 2 meeting, Reynolds requested additional documents, including logs of calls Allen made to Aramark's hotline and text messages between Allen and a manager Allen claimed had harassed her. DSMF ¶¶ 59, 62. Reynolds learned that Aramark had investigated various hotline complaints made by Allen and had responded by terminating two people. DSMF ¶ 61. Otherwise, Reynolds ultimately determined that the only evidence Allen had to support her version of events was her own notes and statements. DSMF ¶ 64. Further, Reynolds did not believe Allen would be a credible witness at the arbitration because she was "fidgety," did not make eye contact, and was easily upset. DSMF ¶ 65.

After collecting this information, Sara Foran—Local 1's director of contract enforcement for Local 1 and Reynold's supervisor—hired a law firm, Allison, Slutsky & Kennedy, P.C., to review and advise on the prospects of winning were the Local to pursue arbitration on Allen's grievance. DSMF ¶ 69; S. Foran Dep. Tr. at 14:10-22, ECF No. 79-3 at 102; *see also* S. Foran

Dep. Ex. 8, ECF No. 79-3 at 123-128. The firm reviewed the CBA, company policies, and grievance file. S. Foran Dep. Ex. 8, ECF No. 79-3 at 123. Its February 20, 2015, letter to Sara Foran "concluded that the Company would likely prevail if the grievance was submitted to arbitration." *Id*. The firm reached this conclusion after making several determinations regarding the evidence surrounding Allen's history of harassment complaints (both by and against her) and the incident leading to her and Camacho's termination. First, with respect to the history of harassment complaints at the company, the firm determined that Aramark "would be able to present evidence to an arbitrator that, among other things, the Company to responsive action pursuant to Mr.[4] [sic] Allen's complaints when evidence was found supporting a particular allegation…" *Id*. at 125. Next, as regards the altercation with Camacho, the law firm concluded that Aramark "would likely be able to prove to an arbitrator's satisfaction that Ms. Allen engaged in the misconduct alleged…. An arbitrator would likely credit Mr. Cerritos' account that, in contrast to Ms. Camacho, Ms. Allen was the aggressor in that confrontation, particularly in light of the corroborating statement from a second witness and the evidence of previous threats and aggressive conduct by Ms. Allen against Ms. Camacho and other employees." *Id*. at 127. Moreover, the law firm noted that, with respect to Camacho's grievance that Local 1 had submitted to arbitration, "the facts will likely show Ms. Allen to have been the aggressor…. Ms. Camacho has a longer tenure with the company… and…in contrast to Ms. Allen, her previous record does not include any documented instance of aggressive or abusive conduct toward coworkers." *Id*.

Based on her investigation, and the advice from the law firm concluding that Local 1 was unlikely to prevail at an arbitration on Allen's behalf, Reynolds recommended against

---

[4] This appears to be a typo rather than a deliberate "misgendering"; the rest of the letter uses the "Ms." mode of address when referring to Allen.

proceeding to arbitration. Foran agreed with the assessment that the Union would not prevail at arbitration and therefore decided not to take Allen's grievance to arbitration and closed Allen's grievance. DSMF ¶¶ 66-73.[5]

## ANALYSIS

## I. Local 1's Request to Exclude Portions of Allen's Declaration

Before turning to the merits of the summary judgment motion, the Court considers Local 1's request to exclude as inadmissible portions of Allen's declaration that she appended to her Response. *See* Decl. of Pl. Keisha Allen in Opposition to Def.'s Mot. for Summary Judgment, ECF No. 90-3. Local 1 argues in its Reply that paragraphs 11-12 and 29-33 of Allen's declaration—stating that Reynolds' attitude toward Allen during their initial November 3 meeting changed upon learning that Allen was transgender—should be excluded under the "sham declaration" rule because they contradict her prior deposition testimony. Reply at 5-7. Arguing that what Allen misperceived as transgender bias was simply a brusque personality that manifested itself from the very beginning of the meeting, Local 1 points to deposition testimony by Allen stating, "In 2014, [Reynolds] was a very – she wasn't a very nice lady, person. It was really brisk, abrupt," and affirming that "from the very beginning in [her] interactions with [Reynolds], she was not warm. She was brisk and abrupt." Weber Supp. Decl. Ex. K, Allen Dep. 199:22-200:3, ECF No. 93-1. In contrast to that description during her deposition, however, Allen's declaration describes Reynolds demeanor during this meeting as very "cordial" and "sympathetic" toward Allen until she realized that Allen was a transgender woman, at which

---

[5] Local 1 did take Camacho's grievance to arbitration, which produced a settlement that gave Camacho $10,000 and the guarantee of a neutral reference from the company. Reynolds Dep. Tr. at 21:4-12, ECF No. 90-5 at 10.

point Reynolds' "attitude abruptly changed" and became "disrespectful. ECF No. 90-3 at ¶¶ 11, 12, 30.

"[A] deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies." *Abraham v. Washington Group Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014); *see also Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken…."). And here, portions of Allen's declaration directly contradict her deposition testimony that "from the very beginning" Reynolds was not warm and empathetic but rather "brisk and abrupt." And Allen's characterization of the facts in her briefing—that "Allen perceived that [Reynolds'] facial expression and body language changed from cheerful greeting to disgust," Resp. at 9, takes even greater license. Nothing in Allen's deposition testimony supports an inference that Reynolds' demeanor changed so radically upon learning that Allen was a transgender woman.

That is not to say, however, that Allen has no basis to argue that Reynolds became less receptive to her complaints after learning that she was a transgender woman. In the same deposition, Allen also stated:

> Q:   And did [Reynolds] ever make any derogatory comments about anyone who was LGBTQ?
>
> A:   Not to me, she didn't. It wasn't until – this is – it wasn't until – it wasn't until she found out that I was a transgender woman that it just seemed like it wasn't no – it – I – I don't know. I just didn't feel – I just didn't feel like she was receptive towards me and my complaints, no, at that time.

*Id.* at 198:6-14. This deposition testimony—in contrast to the testimony on which Local 1 relies—does reflect that Allen perceived some degree of change in Reynolds' attitude toward her

when she learned of her transgender status. Assessing to what degree Reynolds' attitude changed, however, is too nuanced a task for a court to make on summary judgment. Given the internal inconsistency of Allen's deposition testimony, the Court cannot say that her testimony, taken as a whole, is entirely inconsistent with her averment in her declaration on this point. Accordingly, the Court will construe that fact—*i.e.*, Allen's perceived change in Reynolds' receptivity toward her upon learning of Allen's transgender status during the November 3 meeting—in Allen's favor. Whether that change in demeanor is better characterized as going from warm to chilly or from chilly to ice-cold is not an inference the Court can draw and is not in any event material to the Court's ruling.

## II.    Local 1's Motion for Summary Judgment

Summary judgment is only appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding Local 1's motion for summary judgment, the court must construe all facts and reasonable inferences in favor of Allen, the nonmoving party. *Love v. JP Cullen & Sons, Inc*., 779 F.3d 697, 701 (7th Cir. 2015). If Local 1 has demonstrated the absence of a disputed material fact, then the burden shifts to Allen to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch,* 698 F.3d 561, 564 (7th Cir. 2012).

Title VII governs Local 1 as a labor organization. It is unlawful for a covered labor organization "to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c). This clause applies to "the union's role as the employees' agent (in bargaining and in implementing contracts)." *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 652 (7th Cir. 2006). "If [a union] discriminates in the performance of its agency function, it

violates Title VII, but not otherwise." *E.E.O.C. v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 659 (7th Cir. 2003).

Allen claims that Local 1 discriminated against her by failing to press two of her grievances. Allen claims that Local 1 discriminatorily breached its duty to represent Allen under the CBA (*i.e.*, in performing its agency function) and acquiesced in Aramark's hostile work environment by allowing it to continue unchallenged, in violation of Title VII. The first event is the November 3 meeting where Reynolds turned Allen away without helping her file a grievance against Aramark. The second instance occurred after Allen was terminated. At this second juncture, Local 1 processed, investigated, and attempted to resolve Allen's grievance challenging her termination but did not take it to arbitration. Local 1 has moved for summary judgment on both claims.

### A.    November 3 Proposed Grievance

Construing Allen's claim with respect to the November 3 occurrence as a hostile work environment claim, Local 1 argues that it is entitled to summary judgment because it was not Allen's employer.[6] Local 1 claims that "a union cannot be held liable for an employer's hostile work environment."[7] Memo. at 2 (citing *Johnson v. Int'l Longshoreman's Ass'n, Local 815*, 520 Fed. App'x. 452, 453-54 (7th Cir. 2013) and *Phillips v. UAW Int'l*, 854 F. 3d 323, 326-37 (6th

---

[6] Local 1 does not dispute many of the details surrounding Allen's subjection to recurring and severe sexual harassment on the basis of her transgender identity while at Aramark.

[7] Local 1 cites *EEOC v. Pipefitters Assn. Local Union 597*, 334 F.3d 656 (7th Cir. 2003), as a similar situation where the Seventh Circuit found no basis for union liability under Title VII for its failure to redress the employer's hostile work environment. That case, however, dealt with a notably different circumstance where none of the black employees "complained to the union about the racially hostile environment" except for one whose "complaint was narrowly focused on the graffiti that referred to him rather than the ones that referred to blacks in general." *Id*. at 659. That differs from the situation here, where the plaintiff has offered evidence that she specifically sought assistance from the Union to help remedy the employer's supposed violation of the CBA's nondiscrimination provision.

Cir. 2017)). That is true, as far as it goes, but it mischaracterizes Allen's claim. Allen does not claim that Local 1 violated Title VII by failing to prevent or remedy the hostile work environment that Allen encountered; she asserts that Local 1 violated Title VII by doing nothing within its power to address the problem on Allen's behalf. Where a union knows that one of its members is being discriminated against on the basis of protected characteristics, and chooses to do nothing within its power to address the problem, it violates Title VII. That's the holding of the Seventh Circuit in *Maalik*, 437 F.3d at 653. In *Maalik,* the Seventh Circuit reversed a grant of summary judgment for a union that knew, or should have known, that its master mechanics were discriminating against a black female apprentice by denying her the on-the-job training required for qualification as a master mechanic. Acknowledging that the union was not derivatively liable for the discriminatory conduct of its members, the *Maalik* court found that the union **was** "liable for its decision to do nothing in response" to that conduct when it had tools at its disposal to deter the racial and sex discrimination that had been inflicted upon the plaintiff. *Id*. at 653. In this case, Allen maintains that it can be reasonably inferred that she made Local 1 aware of the circumstances surrounding her workplace harassment on November 3. Allen informed Reynolds of her Aramark hotline calls (with confirmation numbers) and escalations to Aramark human resources concerning this harassment. She even provided notes detailing her harassment to Reynolds during this meeting or soon after.[8] In sum, she argues, Local 1 knew or ought to have known what was potentially going on and chose to do nothing. *Maalik*, 437 F.3d at 653.

Local 1 says that in response to a member's hostile work environment complaint, the only action it could have taken was to file a grievance with the company. Allen doesn't dispute

---

[8] The precise date Allen provided Reynolds with these notes is uncertain. Local 1, for the purposes of this motion, assumes that Allen provided them between November 3 and 23. Def.'s Resps. & Objs. to PSMF at 3 n.1. The Court will do the same.

the point; she embraces it. Her claim is that Local 1 should have filed a grievance with Aramark on her behalf when she reported the hostile work environment to Reynolds on November 3 and that, had it done so, the altercation with Camacho—for which Allen was terminated—would not have occurred.

That's a stretch. Even if Reynolds were wrong to turn Allen away on November 3, Allen still does not have a cognizable claim under Title VII because Allen has adduced no evidence from which it can be inferred that had Local been willing to help her on November 3 by filing a grievance with Aramark, the hostility toward Allen would have abated. To the contrary, Local 1 points to several factors that rebut Allen's speculative assertion that all would have been well had the union notified Aramark of Allen's complaints. Allen doesn't have to prove that the union's intervention would have been effective, but she does need to show that the action taken (or not taken) by the union would have been reasonably likely to prevent the harassment from occurring. *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011). Here, the evidence of record falls well short of that standard, providing no reasonable basis to infer that filing a grievance with Aramark on November 3 would have prevented the confrontation less than three weeks later that prompted the company to terminate Allen's employment.

Consider first that Allen had already complained about her harassment to Aramark. Her grievance intake form asserts that she had already reported "all 3" incidents to management. She only specifies two incidents on that form (other than that "derogatory" terms were directed at her generally): being called a "he/she" and being told she was "being too much of a woman thing." Aramark's hotline notes, Weber Decl. Ex. G at UNITE 407-13, ECF No. 79-4 at 52-58, show that Aramark investigated those incidents. First, with regard to the "he/she" slur, Aramark's hotline notes state that on October 10, Allen called the Aramark hotline and reported that her

14

shift leader called her a "he/she," and Aramark terminated the shift leader for that reason back in September. Next, on November 2—only one day before she went to submit her grievance to Local 1—Allen reported to the hotline that an Aramark employee stated "Allen 'was trying too hard to be a woman.'" The hotline notes state, "No corroborating evidence through investigation and interviews found of Allen's claim." *Id*.

There is, then, no basis to conclude that things would have been any different had Reynolds notified Aramark about Allen's claims—Aramark already knew about them and was taking action without prompting by the union. Local 1 also points out that "the Union's remedy for harassment grievances, without any other adverse action present, is to demand that the employer investigate." Reply at 11; DSMF ¶ 30.[9] Whether Aramark's investigations or responses to Allen's complaints were sufficient is not relevant to Local 1's liability. Rather, it is whether Local 1 could have prompted ***Aramark*** to investigate and remedy the alleged workplace hostility that is relevant to whether there is a basis for its liability under Title VII. *See Pipefitters Ass'n Local Union 597*, 334 F.3d at 659 ("If a worker complains to the union that he is being harassed, all the union can do is file a grievance on his behalf against the employer; the union cannot eliminate the harassment itself—that is the company's responsibility."). The record shows that Aramark had been investigating at least some of Allen's complaints about sexual harassment when she presented them to Local 1 on November 3.[10]

---

[9] Reynolds testified that a worker who notifies the company of a hostile work environment has a right to have the company investigate that claim. PSMF ¶ 1. Local 1 cannot help employees grieve against coworkers (also represented by Local 1) for harassment. DSMF ¶¶ 29-30.

[10] Aramark also investigated other complaints by Allen. For example, Allen complained to Aramark on October 13, 2014, that one of her supervisors had been sending inappropriate text messages to her and otherwise harassing her in the workplace. DSMF ¶¶ 60-61; Reynolds Dep. I, 125:4-10; Weber Decl. Ex. G at UNITE 407-13, ECF No. 79-4 at 52. Aramark's notes to the hotline complaint show that that they investigated the issue and found no evidence of

Local 1 also argues persuasively that its later investigation—triggered by Allen's later termination grievance and discussed in greater detail *infra* Section II(B)—revealed that there was no grievable hostile work environment based on the evidence available to Local 1 at that time. That is, even though Local 1 didn't know it on November 3, there was no materially adverse employment action for which it can be held responsible. Local 1's post-termination investigation revealed that (1) Aramark was already investigating Allen's complaints and (2) there was never enough evidence supporting Allen's claims of workplace harassment available to Local 1 for it bring an effective grievance against Aramark for a CBA violation. In essence, even if Local 1 had tried to intervene on Allen's behalf on November 3, such an attempt would have been futile. The record reflects no basis, then, to conclude Local 1's failure to file a grievance in response to Allen's complaints on November 3 resulted in Aramark failing to remedy the workplace hostility Allen alleges she experienced; Local 1 was never able to muster enough evidence to show that Aramark was violating the CBA. And, as addressed in greater detail in the Court's discussion of the post-termination grievance, Allen is unable to show that this determination by the Local 1 was based on discriminatory motives.

Next there is the critical issue of timing. Even if Local 1 did conclude that Aramark had failed to investigate Allen's complaints and decided to pursue a grievance based on Aramark's violation of the CBA's non-discriminatory provision, there were only twenty days between when Allen first approached Local 1 (November 3) and the altercation leading to her termination (November 23). The grievance process is a potentially lengthy one. Local 1 notes that grievance processing under Article 16 of the collective-bargaining agreement takes approximately 61 days,

---

inappropriate behavior. There are numerous other instances where Aramark investigated Allen's calls to the Aramark hotline to complain of sexual harassment or physical violence directed toward her by coworkers occurring prior to or around November 3. *Id*.

even assuming no extensions are granted to either party. Weeks Decl. Ex. A, CBA § 16.4, Dkt. 79-1. The Grievance Procedure sheet provided to grievants states, "The Union will attempt to set up a meeting between you and the Employer within a month of the grievance being filed…. It is important to keep in mind that while many grievances are resolved within the first few months from the date they are filed, other [sic] can take much longer. It is not uncommon for a grievance to go unsettled for more than one (1) year." ECF No. 79-4 at 34. Allen has provided no evidence suggesting that, in light of these facts, a reasonable factfinder could conclude that Local 1 could have staved off further harassment or mitigated the hostile work environment within that time period.

For these reasons, and even viewing the evidence in the light most favorable to Allen, it would be unreasonable to conclude that Local 1 could have effectively mitigated workplace hostility toward Allen before the events giving rise to her termination had it entertained her November 3 attempt for assistance. Local 1 cannot be liable for failing to file a grievance if the evidence shows that the grievance would have been ineffective (whether because the company was already providing the only remedy—investigation—that the Local could have sought or because the grievance process would not have been completed when the company terminated Allen). This issue of causation applies to Allen's claim regarding her November 3 grievance attempt under any applicable theory of union liability under Title VII.[11] *See Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) ("To survive summary judgment on a Title VII discrimination claim, a plaintiff must present 'evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor **caused' the adverse employment action**." (emphasis added) (quoting *Ortiz*,

---

[11] The Court notes that Allen has only brought a Title VII claim against Local 1, not a 42 U.S.C. § 1981 or duty of fair representation claim.

834 F.3d at 765)). No reasonable jury could conclude that Reynolds caused Allen's termination by not going to the company with Allen's November 3 complaints.

### B. Post-Termination Grievance

Allen also claims that Local 1 discriminated against her under Title VII by refusing to press her December 11 termination grievance against Aramark through to arbitration. The parties do not dispute that Reynolds did not recommend moving Allen's case to arbitration after her investigation. PSMF ¶ 5. According to Allen, Reynolds' investigation and ultimate recommendation not to pursue arbitration were motivated by discriminatory bias.

To survive summary judgment on this claim, Allen must "present evidence from which it could be inferred that the union refused to arbitrate [her] grievance *because* of [her protected status]." *Motley v. IAMAW Dist. Lodge 141*, 768 F. App'x 570, 573 (7th Cir. 2019) (citing *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018); *Maalik*, 437 F.3d at 652 (7th Cir. 2006)).

Under *Ortiz*, the Court employs a cumulative assessment of the evidence. This is accomplished not by distinguishing between "direct" and "indirect" evidence but rather determining "whether the evidence [as a whole] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." 834 F.3d at 763-65; *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Local 1's compliance with its internal policies regarding grievance investigations and the CBA's grievance procedures is dispositive.[12] Based on the facts as a whole, a reasonable

---

[12] Although Local 1 addresses Allen's claims under the burden-shifting framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), Allen is not required to tie her evidence to, or establish a prima facie case under, that framework to survive summary judgment. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (observing that a "prima facie case in Title VII litigation ... refers to a common, but not exclusive, method of establishing a triable issue of intentional discrimination." (internal quotation marks omitted)).

factfinder could not find that Local 1 would have pressed Allen's grievance to arbitration if she were not transgender. Upon receiving Allen's termination grievance, Reynolds conducted an undisputedly thorough investigation, which revealed that multiple witnesses identified Allen as the instigator of the altercation. Local 1 nevertheless submitted the grievance to Aramark and held a Step 2 meeting with the company in an attempt to reach a resolution on Allen's behalf. The parties failed to reach a resolution, and Local 1 had to decide whether to send the grievance to arbitration. Local 1's internal policy is to only arbitrate grievances that it believes that it can win. Ultimately, based on its investigation and a consultation with outside counsel, Local 1 decided it did not have the evidence to win Allen's case. It did not send the grievance to arbitration for this reason.

Allen does not identify any potential shortcomings in Reynolds' investigation of her termination grievance. Rather, Allen argues that Local 1's offered reason for not arbitrating her grievance—the grievance's lack of merit—was pretextual. She offers three arguments in support: (1) Local 1 took Camacho's—Allen's proposed cisgender comparator—termination grievance to arbitration even though there was conflicting witness testimony regarding her altercation with Allen; (2) Local 1 "rigged" the law firm's opinion by failing to provide the firm with a complete record; and (3) Allen's declaration testimony regarding the November 3 meeting with Reynolds

---

Allen does not invoke *McDonnell Douglas* or present her argument "in those terms." *David*, 846 F.3d at 224. Allen's use of Camacho as a "comparator," though relevant to a factor in *McDonnell Douglas* (as could be expected with many types of evidence in discrimination cases), is a point the Court considers in conducting its cumulative assessment under *Ortiz*. Moreover, Local 1 argues that Allen has failed to show that Local 1's reason for not pursuing arbitration was pretextual, and Allen does not object to analyzing her claim in that manner. But the question of pretext similarly operates as part of the cumulative assessment and does not pigeonhole Allen's claims into a framework that she does not invoke. Accordingly, the Court will not make itself, the evidence, or the parties unnecessarily beholden to the *McDonnell Douglas* framework in this instance. As a final point, the Court notes that the evidentiary deficiencies here would be dispositive under either framework.

evinces Reynolds' anti-transgender bias, which infected her ability to credit Allen's version of events and impartially decide whether to continue pressing her grievance.

None of these arguments, even considered collectively, are sufficient to establish grounds for a reasonable factfinder to find that Local 1's proffered reason for closing Allen's grievance without arbitration was pretextual. As to Local 1's comparative handling of Allen and Camacho's termination grievances, Allen's focus on evidence concerning who instigated the altercation is misplaced. The relevant inquiry is whether Local 1's decision to credit Camacho's version of events and push her grievance to arbitration, but not Allen's, was because of Allen's protected status. That is, did Local 1 arbitrate Camacho's grievance but not Allen's because Camacho was cisgender and Allen was transgender? As Local 1 points out, Allen does not dispute that Aramark terminated Allen for threatening Camacho with physical violence. Although Allen identifies evidence suggesting that the other witness statements were inconsistent with respect to certain details, casting some doubt on whether she actually instigated the dispute and threatened Camacho, she does not dispute that all three witnesses, including one manager, were consistent in stating that Allen made a statement widely understood to constitute a threat of violence toward her coworker. In addition, Allen admits that she used profanity and raised her voice during the altercation when she told Camacho to "get the fuck out of my face." Local 1's liability does not depend on who instigated the altercation but rather on whether its determination that it did not have enough evidence to support Allen's grievance at arbitration was legitimate. The differential treatment, on its own, does not shed any light on the answer to that question.

Second, Allen cites the testimony of Sara Foran and the letter from the law firm Local 1 engaged to opine on its prospects at arbitration in making the baseless claim that Local 1

withheld Allen's notes from the file sent to the firm when seeking its advice. To put it charitably, the record does not support this assertion. The testimony that Allen cites does not indicate that Local 1 deliberately withheld, or inadvertently omitted, Allen's notes detailing her harassment from the file it sent the law firm. In fact, Foran testified that "[e]verything that was used in the investigation of the case" was included in the grievance file that she sent to the law firm. Foran 25:16-19. Further, while true that the law firm letter, ECF No. 79-3 at 122 (UNITE 000415-420), does not expressly address Allen's notes, that is not sufficient to raise the inference that Local 1 did not provide those notes to the firm, especially in light of witness testimony to the contrary. Further still, there is no reason to infer that the law firm's recommendation would have been different had it had the notes. The law firm considered Aramark's hotline log showing that Allen had previously complained of harassment by managers and coworkers and that Aramark investigated these complaints in reaching its conclusions. ECF No. 79-3 at 125 (UNITE 000417). The law firm's conclusion that Local 1 would be unlikely to succeed at arbitration was still based in large part on the fact that no one else could corroborate Allen's version of events; Allen's personal notes—which do not identify any witnesses to the altercation other than those whose testimony the union considered—could not change that fact.

Finally, as discussed *supra*, Allen has offered testimony that Reynolds' receptivity toward her deteriorated during their first meeting when she learned of Allen's transgender status. This subjective observation, even viewed cumulatively with the rest of the evidence, is insufficient to raise an inference that Local 1's evaluation of her grievance as unmeritorious and decision not to arbitrate was dishonest. "Plaintiffs cannot prevail at trial if the fact-finder finds that the [employer] honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." *Bell v. E.P.A.*, 232 F.3d 546, 550 (7th Cir. 2000).

There are abundant examples where plaintiffs offering far more convincing indicia of hostility than what Allen has offered here failed to establish pretext. In *Ptasznik v. St. Joseph Hosp.*, the Seventh Circuit laid out a few of them:

> For example, in *Ballance v. City of Springfield,* despite evidence that a similarly situated black police officer had been treated more favorably, we held that a white officer's discrimination suit could not survive summary judgment because the police chief honestly believed the officer's disciplinary problems warranted his termination. 424 F.3d 614, 621 (7th Cir. 2005). Similarly, in *Alexander v. Wisconsin Dep't of Health & Family Services,* 263 F.3d 673, 687 (7th Cir. 2001), where an African–American plaintiff claimed that his race motivated his termination, we concluded evidence that fellow employees had made numerous racially hostile comments did not rebut the employer's evidence that the plaintiff was terminated for insubordination and threatening coworkers. And, more analogously, in *Rozskowiak v. Village of Arlington Heights,* 415 F.3d 608, 611 (7th Cir. 2005), the plaintiff's supervisor told him he "would probably be losing [his] job because [he] was a stupid Polack" and made other derogatory comments about his Polish ancestry. We affirmed summary judgment to the defendants, reasoning that the derogatory remarks were unrelated to the plaintiff's termination, and the plaintiff was terminated for legitimate, job-related reasons. *Id.* at 612.

464 F.3d 691, 696-97 (7th Cir. 2006). Consistent with these precedents, the *Ptasznick* court similarly affirmed a grant of summary judgment for the defendant employer where the plaintiff failed to adduce evidence that the employer's proffered reason for terminating the plaintiff's employment was pretextual.

Here, as well, there is not sufficient evidence to infer that Reynolds' alleged bias infected her investigation or Local 1's evaluation of the merits of Allen's grievance. Indeed, Allen does not dispute that Sara Foran—not Reynolds—is the Local 1 representative who ultimately decided not to pursue arbitration for Allen's grievance. DSMF ¶ 72. To be sure, this decision was based in part on Reynolds' recommendation, but that recommendation was justified by Reynolds' decidedly detailed investigation and validated by the outside law firm's independent assessment.

Again, Allen has not identified any shortcomings in Reynolds' investigation. Allen must show that Reynolds or Local 1 would have treated her differently if she were not transgender. But regardless of whether Reynolds harbored any discriminatory animus toward Allen, Allen has not shown that Reynolds could have conjured up witnesses to support Allen's case at arbitration, given more credit to Allen's uncorroborated account of the events leading to and during the altercation with Camacho, or otherwise convinced Local 1 that Allen's grievance had enough merit to likely succeed in arbitration. *See Motley*, 768 F. App'x at 573 ("The union determined that arbitration would be futile based on the evidence against [the plaintiff] (including his own admissions and other witnesses' statements) and the negative connotations of his flying while on medical leave, and [the plaintiff] has not directed us to any evidence that suggests the union did not honestly believe the stated reasons for its decision."). Allen has not produced sufficient evidence for a reasonable juror to find that anything but the merits of Allen's grievance, based on the evidence available to Local 1 at the time, caused Local 1 to decide not to pursue arbitration.

### C. Allen's Retaliation Claim Against Local 1

Summary judgment is also appropriate on Allen's retaliation claim against Local 1 to the extent such a claim exists. The Seventh Circuit has "yet to decide whether unions in their capacity as labor organizations can be liable under Title VII for retaliation." *Ali v. Int'l Bhd. of Elec. Workers, Loc. 21*, 411 F. App'x 917, 918 (7th Cir. 2011) (collecting cases). As Local 1 rightly points out, however, this Court does not need to reach that question here.[13] Although Allen claims in her amended complaint that Local 1's failure her to protect her resulted in Aramark retaliating against her for prior protected activity, FAC ¶ 242, she does not allege that Local 1 *itself* retaliated against her in performing its union functions. As in *Ali*, Allen cannot

---

[13] Allen does not address Local 1's arguments regarding her retaliation claim in her response.

hold Local 1 liable for retaliation under Title VII here without showing that Local 1, as opposed to only Aramark, took any actions against her for retaliatory reasons. *See* 411 F. App'x at 919. Allen does not even purport to have made such a showing.

*    *    *

For the foregoing reasons, the Court grants defendant Local 1's Motion for Summary Judgment. Judgment will be entered in favor of the defendant, Unite Here Local 1.

Dated: September 16, 2022

John J. Tharp, Jr.
United States District Judge